# In the United States Court of Federal Claims

No. 03-2201C

(Filed July 9, 2004)

| | |
|---|---|
| * * * * * * * * * * * * * * * * * * * * * * * * * * * * )<br>TIGER NATURAL GAS, INC., )<br>Plaintiff, )<br>v. )<br>UNITED STATES, )<br>Defendant. )<br>* * * * * * * * * * * * * * * * * * * * * * * * * * * * | Breach of contract; claim against contractor by General Services Administration; motion to dismiss; jurisdiction over claim for declaratory relief; 28 U.S.C. § 1491(a)(2); Rule 12(b)(6); interest; 41 U.S.C. § 611 |

Sandeep S. Kathuria, General Counsel, Tiger Natural Gas, Inc., Tulsa, Oklahoma, for plaintiff.

Michael F. Bahler, Attorney, Commercial Litigation Branch, Civil Division, Department of Justice, Washington, D.C., for defendant. With him on the briefs were Assistant Attorney General Peter D. Keisler, David M. Cohen, Director, Commercial Litigation Branch, Civil Division, Department of Justice, Washington, D.C., and Mark A. Melnick, Assistant Director, Commercial Litigation Branch, Civil Division, Department of Justice, Washington, D.C.

## OPINION AND ORDER

LETTOW, Judge.

This contract case is before the Court on defendant's motion to dismiss pursuant to Rule 12(b)(6) of the Rules of the United States Court of Federal Claims ("RCFC") for failure to state a claim upon which relief can be granted. Plaintiff, Tiger Natural Gas, Inc. ("Tiger" or "TNG"), challenges a claim made by the General Services Administration ("GSA") for alleged breach of a guarantee contained in a contract for installation of a propane backup system at the Fort Worth Federal Center in Ft. Worth, Texas. After the propane backup system had been fully installed and Tiger had been paid all amounts due under its contract with GSA, GSA asserted that Tiger had guaranteed that the government would realize a certain level of savings by qualifying for an

interruptible rate for natural gas supplied to the Forth Worth Federal Center. Contending that the allegedly guaranteed savings had not been obtained, GSA made a claim against Tiger for damages, invoked a right of setoff, and withheld payments due Tiger under unrelated contracts between Tiger and GSA. Tiger filed a complaint contesting GSA's claim and the setoff. Approximately six months after the complaint was filed, GSA paid Tiger the amounts that had been setoff and now contends that the repayment moots the action. GSA also asserts that, on a prudential basis, jurisdiction to award equitable relief is lacking, and that Tiger cannot now make a viable claim that it is entitled to declaratory relief. GSA further argues that Tiger is not entitled to receive interest on the amount previously offset. The motion to dismiss has been fully briefed, and a hearing was held on June 10, 2004. For the reasons set out below, the Court denies the government's motion to dismiss and, treating the motion as one for summary judgment, denies that motion as well.

## BACKGROUND[1]

### *A. The Contract, Contracting Officer's Final Decision, Offset of Contractor's Funds by the Government*

In May 2000, GSA issued a Notice Concerning Solicitation ("Solicitation") for the installation of a propane backup system at the Fort Worth Federal Center. Compl. ¶ 4 & Ex. A. The Solicitation described the required services as follows:

> The Government requires energy conservation services at the Fort Worth Federal Center in Fort Worth[,] Texas, and seeks to obtain these services using this energy savings performance contract (FSPC) solicitation. The successful awardee will provide, at no capital cost to the Government, all labor, material, and equipment necessary to reduce utility costs at the Fort Worth Federal Center. Contracted services may also include operations and maintenance services during the contract term, as required in the technical sections of this specification and as proposed by the contractor and accepted by the Government. In return, the contractor will receive payment based on the guaranteed annual cost savings from its installed energy-conservation measures (ECMs).

Compl. Ex. A ¶ B.1. GSA estimated that a propane backup system would save it approximately $60,000 in annual costs. The local utility company, TXU Electric & Gas Corporation ("TXU"), was selling natural gas to GSA under a firm, commercial rate. Compl. ¶¶ 4-5. Upon completion

---

[1]The facts are largely drawn from the complaint and the exhibits appended to the complaint. In addition, the government included a documentary appendix to its motion to dismiss, and Tiger similarly attached documents to its opposition to this motion. At the Court's request, the parties also filed a Joint Supplement to the Record after briefing was completed.

of the envisioned improvements to the Forth Worth Federal Center, GSA would be able to convert to purchasing natural gas under a cheaper interruptible rate. Compl. Ex. A ¶ B.2.d. The Solicitation required that the contractor verify with TXU that $60,000 was a reasonable cost savings resulting from the installation of the proposed propane backup system. *Id.*

Tiger confirmed the reasonableness of this estimate with TXU, Compl. ¶ 4, and responded to the Solicitation by submitting Technical and Price Proposals in June 2000. *Id.* ¶ 6. Based upon the average yearly gas consumption figure of 36,946 mcf (thousand cubic feet) provided by GSA, *id.*, Tiger concluded that GSA could save $66,438.62 by switching to an interruptible, industrial gas rate. Compl. Ex. D at 9 ("Yearly Savings Explanation").

In July 2000, GSA requested an explanation of Tiger's estimated annual cost savings plan and a guarantee of savings. Compl. Ex. E (letter from Carol Lautzenheiser, GSA Contracting Officer, to Bradley Johnson, Tiger (July 27, 2000)). In August 2000, Tiger explained its plan:

> TNG has reviewed past natural gas usage for your facility, thus, knowing the average annual consumption rate. The local LDC [local distribution company] rates have been established for both commercial and industrial facilities. With the backup system in place, your facility will be qualified to buy interruptable [*sic*] service and the LDC rate will be negotiated from commercial to industrial. Please refer to Technical Proposal Yearly Savings explanation.

Compl. Ex. F. at 1 (Letter from Bradley Johnson to Carol Lautzenheiser (Aug. 1, 2000)). Concurrently, Tiger cited four factors that precluded providing a savings guarantee. *Id.* at 2.[2] Tiger concluded that "with past market performance TNG is willing to accept liability of the contract and proceed with a contract if awarded." *Id.*

GSA responded by asking, among other things, whether Tiger's promise to "accept liability of the contract" amounted to a savings guarantee. Compl. Ex. G ¶ g (GSA Comments (Aug. 1, 2000)). In September 2000, Tiger replied that it could still not provide a savings guarantee "unless [GSA] can guarantee that the consumption at [its] facility will stay at the levels indicated in the 96-97 consumption records (36,946 mcf)." Compl. Ex. H at 3 (letter from Bradley Johnson to Carol Lautzenheiser (Sept. 5, 2000)). Tiger provided two further savings estimates. Under one estimate, based on the 1998-1999 consumption level for the Fort Worth

---

[2]Tiger advised that a

> [g]uarantee of savings cannot be supported without future knowledge of the following factors: a. LDC rates could increase and/or decrease over a period of time. b. The Natural Gas Industry could change at any time. c. Transportation rates could change at any time. d. Building Occupancy could change at any time.

Compl. Ex. F at 2.

Federal Center, Tiger concluded that "savings of over $44,000 per year [are] possible." *Id.* Under the second estimate, based on the 1999-2000 consumption level, Tiger estimated that GSA could save $29,837.38. *Id.* at 6. Although Tiger's reply in September 2000 did not expressly mention the need for conversion to an interruptible, industrial gas rate, the accompanying materials showing how its savings estimates were derived made references to use of the interruptible rate as the basis for the savings. *Id.* at 4-6, 9.

GSA awarded contract number GS-07P-00-HHC-0066 ("Contract") to Tiger on October 13, 2000. Compl. Ex. I. During installation of the propane backup system, a representative from TXU inspected the installation to confirm GSA's eligibility for the interruptible, industrial gas rate. Compl. ¶ 10. Tiger completed installation on March 21, 2001, and GSA paid Tiger under the terms of the contract. *Id.* On or before March 23, 2001, TXU contacted Tiger to confirm whether Tiger would supply gas to the Fort Worth Federal Center. *Id.* ¶ 11. At Tiger's behest, *id.*, TXU contacted GSA to execute a "standard gas transportation agreement used for federal agencies." *Id.* ¶ 12. In July 2001, GSA refused to sign the contract with TXU for conversion to an interruptible, industrial gas rate. *Id.* ¶ 13.[3]

Absent conversion to an interruptible, industrial gas rate, GSA enjoyed no savings as a result of the Contract. In July 2002, the Contracting Officer for GSA wrote to Tiger advising that GSA had not realized "guaranteed savings of $29,837.38 per year" as Tiger purportedly promised in its September 2000 clarification. Compl. Ex. K (letter from Carol Lautzenheiser to R. Phillips (July 12, 2000)). The Contracting Officer asked Tiger to pay for the savings that had not been realized, amounting to $37,296.73. *Id.* Tiger responded that GSA's contract interpretation was erroneous, arguing that "the Contract does not include a savings guarantee by TNG." Compl. Ex. L (letter from J. Kevin Hayes to Carol Lautzenheiser (Aug. 6, 2002)). Tiger asked for relief in the form of a decision to that effect. *Id.*

GSA's Contracting Officer then rendered a final decision, asserting that the Energy Policy Act of 1992 would have precluded a contract with Tiger if Tiger had not provided a savings guarantee. Compl. Ex. M (letter from Carol Lautzenheiser to J. Kevin Hayes (Sept. 19, 2002)). GSA pointed to Paragraph B.2.1(b)2 of the Solicitation, which provided that "the offeror shall

---

[3]The reason for GSA's refusal is in dispute. In its complaint, Tiger stated a belief that GSA objected to the inclusion of a curtailment-indemnification clause in the proposed contract with TXU, which clause GSA argued might be contrary to federal law. Compl. ¶ 13. Tiger further averred that other GSA divisions have at least twelve contracts with TXU employing substantially identical curtailment-indemnification clauses. *Id.* ¶ 13. At the hearing, counsel for the government explained that GSA understood the contract with Tiger to require Tiger to negotiate the new rate with TXU on GSA's behalf. Hr'g Tr. at 6. As a result of Tiger's failure to undertake this alleged contractual obligation, GSA avers that it took two years for it to negotiate an acceptable rate with TXU. *Id.* Tiger disputes that it was obligated to negotiate an interruptible-rate contract on GSA's behalf. *See id.* at 26.

complete Schedule 1 to reflect the estimated Government share of annual cost savings after ECM [energy-conservation measure] installation and acceptance by the Government" and concluded that Tiger had entered a "performance contract." *Id.* GSA demanded $39,783.17, representing the unrealized guaranteed savings from April 2001 to the date of the letter, plus interest. *Id.* at 2. The Contracting Officer advised that her final decision was being entered in accord with Federal Acquisition Regulations ("FAR") [48 C.F.R.] part 33.2 and General Services Administration Manual part 533.2. *Id.*

Tiger did not pay GSA the amount requested by the Contracting Officer in her final decision of September 19, 2002. To satisfy its demand against Tiger, GSA undertook to withhold payments on other, unrelated contracts between Tiger and GSA. GSA notified Tiger of its setoff in March 2003, when it returned as unpaid, invoices issued by Tiger respecting other contracts. Joint Supp. to Record Ex. 1 (letter from Carol Lautzenheiser to R. Smith (Mar. 27, 2003)). However, in April 2003, GSA inadvertently released to Tiger the amounts it initially intended to offset. Compl. ¶ 18. Thereafter, in August 2003, GSA successfully offset payments totaling $44,125.55 from unrelated contracts with Tiger. Pl.'s Opp'n to Def.'s Mot. to Dismiss Ex. 2. This amount included the amount of GSA's "lost" savings, plus interest.

*B. Procedural Developments Before the Court and Repayment of the Offset Funds*

Tiger filed its complaint in this Court on September 17, 2003, a few days before the expiration of the twelve-month statutory deadline for suit on a claim established by Section 10(a)(3) of the Contract Disputes Act of 1978, as amended ("CDA"), 41 U.S.C. § 609(a)(3).[4] *See* Compl. Ex. M (Letter from Carol Lautzenheiser to J. Kevin Hayes (Sept. 19, 2002)).[5]

---

[4]In December 2002, Tiger unsuccessfully appealed the contracting officer's final decision to the General Services Board of Contract Appeals ("GSBCA"). *See* Joint Supp. to Record Ex. 2. Tiger submitted the notice of appeal to a courier service for delivery to the GSBCA pursuant to the 90-day deadline of the CDA, 41 U.S.C. § 606. The notice of appeal was in a package that did not contain a particular room or telephone number on its airbill, and the courier had difficulty locating an individual within the GSBCA's building who would accept the package. After several attempts, four days after the 90-day deadline had expired, the courier succeeded in delivering the package. Because the notice of appeal was filed outside the statutory deadline, the GSBCA dismissed the appeal for lack of jurisdiction in July 2003. *Id.* The GSBCA never addressed the merits of the case and lacked jurisdiction to do so. As such, Tiger's filing before the GSBCA has no effect on these proceedings. *See National Neighbors, Inc. v. United States*, 839 F.2d 1539, 1542 (Fed. Cir. 1998) (holding that an appeal to an agency board of contract appeals is considered an "absolute nullity" when such board lacks jurisdiction over the matter).

[5]Tiger avers that with installation of the propane backup system and payment under the Contract, it had fully concluded contract performance. Compl. ¶ 10. *See also* Hr'g Tr. at 17 ("[w]e have a case here where contract performance has been completed for more than three years"). Moreover, Tiger argues that GSA acknowledged Tiger's completed performance with

After the government sought and obtained four enlargements of time to respond to Tiger's complaint, GSA paid Tiger the entire amount of the offset funds on March 29, 2004. Pl.'s Opp'n to Def. Mot. to Dismiss Ex. 2 (letter from Carol Lautzenheiser to Sandeep Kathuria (Mar. 29, 2004)).[6] In connection with the payment, GSA's Contracting Officer advised that the release of the offset funds did not constitute a change in GSA's position regarding interpretation of the contract:

> I will withdraw my initial final decision to the extent that I am releasing the offset, plus interest withheld, associated with the current litigation, Docket No. 03-2201C[,] which totals $44,125.55. I wish to emphasize that this letter is in no way a concession of our positions regarding the proper interpretation of the contract.

*Id*. The government subsequently filed its motion to dismiss.

## DISCUSSION

### STANDARD FOR DECISION

A federal court's review of a complaint on a motion to dismiss is a limited one, focusing not on "whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Pi Elecs. Corp. v. United States*, 55 Fed. Cl. 279, 284-85 (2003) (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974)). "[A] complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Id.* at 285 (quoting *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957)). Under RCFC 12(b)(6), the Court must accept as true the facts alleged in the complaint, *id.* (citing *Davis v. Monroe County Bd. of Educ.*, 526 U.S. 629, 633 (1999)), and must construe all reasonable inferences in favor of the non-movant. *Id.* (citing *Sommers Oil Co. v. United States*, 241 F.3d 1375, 1378 (Fed. Cir. 2001)).

The Court is mindful of the distinction between a motion to dismiss pursuant to RCFC 12(b)(6) and one for summary judgment under RCFC 56. When evaluating a motion to dismiss

---

the Contracting Officer's final decision. Hr'g Tr. at 17. GSA disputes this position, maintaining that the contract performance includes a ten-year savings guarantee and requires Tiger to maintain the propane backup system for that time. *Id*. at 29.

[6]Before Tiger filed its complaint in September 2003, GSA had advised Tiger via two telephone conversations that GSA intended to offset an amount totaling $29,584.81. Compl. ¶¶ 19-20. Accordingly, Tiger requested this amount in its Complaint. Compl. at 7. However, GSA offset payments to Tiger in August 2003 totaling $44,125.55. It was this latter amount that GSA paid to Tiger in March 2004.

for failure to state a claim under RCFC 12(b)(6), the Court cannot consider material beyond the pleadings. *J & E Salvage Co. v. United States*, 36 Fed. Cl. 192, 196 n.3 (1996), *aff'd*, 152 F.3d

945 (Fed. Cir. 1998). In connection with a motion under Rule 12(b)(6), when evidence outside the pleadings is presented to and not excluded by the Court, "the motion shall be treated as one for summary judgment and disposed of as provided in RCFC 56, and all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by RCFC 56." RCFC 12(b) (last sentence). *See Brubaker Amusement Co. v. United States*, 304 F.3d 1349, 1355 & n.1 (Fed. Cir. 2002). The notice requirement in this provision "offers the parties a full opportunity to prepare for and comply with the requirements of Rule 56." *Booth v. United States*, 990 F.2d 617, 620 (Fed. Cir. 1993) (citing *Selva & Sons, Inc. v. Nina Footwear, Inc.*, 705 F.2d 1316, 1322 (Fed. Cir. 1983)). If the Court chooses to rely on evidence outside the pleadings, summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." RCFC 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

## JURISDICTION

Tiger asserts that the Court has jurisdiction over this matter pursuant to Section 10(a)(1) of the CDA, 41 U.S.C. § 609(a)(1), and the Tucker Act, 28 U.S.C. § 1491. Compl. ¶¶ 2-3. The government has contested this Court's jurisdiction to grant declaratory relief in light of the factual setting of this case. Def.'s Mot. to Stay Proceedings at 2. Adverting to a prudential basis for avoiding issuance of a declaratory judgment absent compelling grounds, the government suggests that dismissal is appropriate because all offset funds have been returned and there remains only "a theoretical dispute that may never rise to an actionable claim." Def.'s Reply at 3. The government's arguments in this regard are unavailing.

The Tucker Act provides that this Court's jurisdiction extends to "any claim by or against, or dispute with, a contractor arising under section 10(a)(1) of the Contract Disputes Act[, 41 U.S.C. § 609(a)(1)]." 28 U.S.C. § 1491(a)(2). The 1992 amendments to the Tucker Act specified that this jurisdiction extended to "other nonmonetary disputes on which a decision of the contracting officer has been issued under section 6 of the [CDA, 41 U.S.C. § 605]." *Id.*, as amended by Title IX of the Federal Courts Administration Act, Pub. L. No. 102-572, § 907(b), 106 Stat. 4506, 4519. The third sentence of 28 U.S.C. § 1491(a)(2) now provides:

> The Court of Federal Claims shall have jurisdiction to render judgment upon any claim by or against, or dispute with, a contractor arising under section 10(a)(1) of the Contract Disputes Act of 1978, including a dispute concerning termination of a contract, rights in tangible or intangible property, compliance with cost accounting standards, and other nonmonetary disputes on which a decision of the contracting officer has been issued under section 6 of that Act.

In *Alliant Techsystems, Inc. v. United States*, 178 F.3d 1260 (Fed. Cir. 1999), the Federal Circuit explained that, as amended, 28 U.S.C. § 1491(a)(2) contemplates suits in this Court for declaratory judgments on nonmonetary claims. The contractor in *Alliant* sought declaratory relief from this Court to avoid performance under a contract option without making a claim for monetary damages. *Alliant*, 178 F.3d at 1264. The Federal Circuit upheld the trial court's decision that it had jurisdiction to grant declaratory relief, explaining that "nonmonetary claims are not outside the jurisdiction of the Court of Federal Claims simply because the contractor could convert the claims to monetary claims by doing the requested work and seeking compensation afterwards." *Id.* at 1270. *See also Garrett v. Gen. Elec. Co.*, 987 F.2d 747 (Fed. Cir. 1993).

In upholding this Court's equitable jurisdiction over nonmonetary contract claims arising under the CDA, the Federal Circuit relied principally on the plain meaning of 28 U.S.C. § 1491(a)(2), pointing out that in the 1992 amendments to the Tucker Act, Congress used "expansive, not restrictive," and "open-ended language." *Alliant*, 178 F.3d at 1268. The court focused on the statutory mention of "any claims" and reference to nonmonetary disputes after use of the nonrestrictive term "including." *Id.* The Federal Circuit added that the legislative history of the 1992 amendments to the Tucker Act did not justify precluding a contractor from seeking a declaratory judgment for an ongoing performance issue. *Id.* at 1269.

In *Alliant*, the Federal Circuit also addressed prudential considerations affecting jurisdiction. Respecting the government's argument that such considerations operated as a limit on this Court's jurisdiction, the court of appeals observed that this contention "confuses the question whether the Court of Federal Claims had jurisdiction to entertain Alliant's complaint with the question whether the court should grant relief on the merits and what form such relief should take." *Id*. at 1270 (citing *Spruill v. Merit Sys. Protection Board*, 978 F.2d 679, 686 (Fed. Cir. 1992)). The Federal Circuit was satisfied "that neither Congress nor the drafters of the FAR intended to create a comprehensive 'prudential' basis for dismissing all but a narrow class of actions on nonmonetary claims brought in the Court of Federal Claims." *Id.* at 1271. In short, the court of appeals held that the "jurisdiction of [the Court of Federal Claims] is defined by Congress, and the 'prudential consideration' that the government presses upon us cannot alter the jurisdictional lines that Congress has drawn." *Id.* at 1270.

The Federal Circuit's decision in *Alliant* stands squarely in the path of the government's argument that prudential considerations constrain this Court's jurisdiction over equitable claims arising under the CDA. Jurisdiction unquestionably exists based upon the GSA Contracting Officer's final decision to assert a claim against Tiger based upon an alleged savings guarantee in the Contract regarding an alternative fuel source for the Fort Worth Federal Center. Notably, her subsequent decision to release the offset funds was accompanied by an express reservation of the government's position regarding interpretation of the Contract, and thus nothing in the Contracting Officer's post-suit actions elides the jurisdiction that was established when the Complaint was filed.

FAILURE TO STATE A CLAIM

1. *Declaratory judgment.*

As a concomitant contention to its jurisdictional argument, the government asserts that this action should be dismissed based upon RCFC 12(b)(6) because Tiger has failed to state a claim upon which relief can be granted. Conceding that the Tucker Act authorizes this Court to issue declaratory judgments in some contract disputes, the government asserts that this is not an appropriate case for such a judgment.

Essentially, the government takes the position that with GSA's release of the offset in March 2004, there is no longer a live dispute within the meaning of *Alliant*. Hr'g Tr. at 14-19. As the government would have it, GSA's unilateral return of the money diffused the dispute on which Tiger based its complaint, and thus the release moots the case. Hence, there is no urgency, immediacy, or pressing need for the Court to award a declaratory judgment, and the "spirit of *Alliant*" should forestall equitable relief. *See id*. at 31. *See also id*. at 35. To bolster this argument, counsel for the government represented at the hearing that GSA will not in the future assert any claim based on the alleged contractual guarantee for the period between Tiger's completion of the installation project and GSA's execution of the supply contract with TXU. *Id*. at 29 ("[W]e do represent on the record that we are not going to pursue a claim against Tiger for the period of time before we switched to TXU Gas Service, which I believe was May 2003."). *See also id*. at 11.

The government's arguments are realistically ones for summary judgment rather than for dismissal because they rely primarily on the Contracting Officer's post-suit return of the offset funds in March 2004. The government's argument that its dispute with Tiger is moot is critically flawed in light of the fact that the GSA Contracting Officer adheres to her position that the underlying contract contains a performance guarantee. Nonetheless, the government contends that a stronger showing is required to justify equitable relief than has been made by Tiger. In *Alliant*, the court of appeals opined that in adjudicating claims for declaratory relief this Court was "free to consider" factors that included: "whether the claim involves a live dispute between the parties, whether a declaration will resolve that dispute, and whether the legal remedies available to the parties would be adequate to protect the parties' interests." *Alliant*, 178 F.3d at 1271. As *Alliant* observes, these factors are merely aspects of "the traditional rule that courts will not grant equitable relief when money damages are adequate." *Id.* Furthermore, statutory authority for this Court to grant declaratory relief "allows the court . . . to restrict the occasions for intervention during contract performance to those involving a fundamental question of contract interpretation or a special need for early resolution of a legal issue." *Id.*

The Court is satisfied that Tiger has demonstrated that there is an ongoing, "live" dispute between Tiger and the government. GSA's first demand for payment from Tiger established the government's contention that Tiger is under a continuing obligation to guarantee GSA a certain level of savings. Despite the subsequent reimbursement of the offset funds, GSA maintains its

position based upon its interpretation of the Contract. Moreover, GSA's counsel has asserted that Tiger is additionally obligated to provide maintenance on an ongoing basis. *See supra*, at 5 & n.5.

The government's counsel has asserted that GSA will not pursue a further claim for the period prior to GSA's conversion to an interruptible, industrial gas rate with TXU. Hr'g Tr. at 11, 29. Such a promise, however, disregards the government's own contention that the contractual guarantee and maintenance obligation have a ten-year term. As the government would have it, GSA may avoid a determination of liability at this point yet still make a future claim against Tiger for the period subsequent to GSA's switch to the interruptible rate. Ultimately, the government's magnanimity not to exercise its right of offset does not extend beyond its own chosen point in time.

Tiger's claim for a declaratory judgment thus survives GSA's voluntary release of the offset. Whether or not the Court decides ultimately to award Tiger declaratory relief, Tiger has met the requirements to overcome GSA's motion to dismiss. And, treating the motion to dismiss as a motion for summary judgment, on this record the government has not demonstrated that it is entitled to judgment as a matter of law regarding the nature of any guarantee included in GSA's contract with Tiger. Additionally, the record shows genuine issues of material fact regarding the likelihood that any such guarantee would be triggered during the remaining term of the Contract. The government's motion thus must also be denied under the standards of RCFC 56. Tiger is entitled to put forward its evidentiary proofs on whether a declaratory judgment is appropriate.

### *2. Interest.*

The release of the offset funds has also left a residual dispute. As previously noted, in Tiger's Complaint, in addition to a declaration regarding its obligations under the Contract with GSA, Tiger requested the release of the amount offset, plus interest for the period the offset was withheld. The government contends that the release of the exact amount of the offset is sufficient to negate any direct claim Tiger might have for a monetary award such that no additional amount is due. Hr'g Tr. at 29. Tiger maintains its claim for interest on the offset amount for the period the offset was withheld, *i.e.*, between August 2003 and the end of March 2004. *Id*. at 26-27.

Pursuant to the CDA, "[i]nterest on *amounts found due* contractors on claims shall be paid to the contractor from the date the contracting officer receives the claim pursuant to section 605(a) of [Title 41] from the contractor until payment thereof." 41 U.S.C. § 611 (emphasis added). In adopting this provision, Congress anticipated that a contractor would be entitled to interest "following either a final decision of the agency board or a court of competent jurisdiction, or a settlement between the contractor and the Government prior to a decision by the agency boards or the courts." S. Rep. No. 95-1118 at 32 (1978). *See also Esprit Corp. v. United States*, 6 Cl. Ct. 546, 549 (1984) (observing that "to allow interest to run against the government

absent a dispute would not serve the purpose of the interest provision of the CDA"), *aff'd*, 776 F.2d 1062 (Fed. Cir. 1985) (table).

The question thus arises whether this Court has before it a dispute of a nature such that its resolution would result in an "amount[] found due" within the meaning of 41 U.S.C. § 611. Statutes authorizing awards of interest against the government must be expressly followed and strictly construed. *Library of Congress v. Shaw*, 478 U.S. 310, 314-15 (1986) (explicating the general applicability of the no-interest rule); *United States v. New York Rayon Importing Co.*, 329 U.S. 654, 659 (1947); *Fidelity Constr. Co. v. United States*, 700 F.2d 1379, 1383 (Fed. Cir. 1983).[7] A declaratory ruling on the alleged contractual guarantees underpinning the government's claim will clarify whether the offset was proper, but, because the government has already repaid the offset amount, the question then would become whether such a ruling would establish an "amount[] found due" for purposes of avoiding interest. In short, the Court must determine whether the government may forestall an entitlement to interest by repaying voluntarily the amount in dispute on a claim by its contracting officer, while both maintaining its position on contractual interpretation and providing no interest during the time of the offset.

The government argues that "Tiger has simply failed to meet its burden of demonstrating that Congress unambiguously authorized the award of interest in the current situation." Def.'s Reply at 6. The government contends that "'amounts found due' cannot be reasonably read to refer to a contracting officer's revised final decision. Rather, logic and principles of statutory construction dictate that the 'amounts found due' contemplate[] an adjudication by either a court or administrative body." *Id*. at 5-6 (citing *Crowley v. United States*, 57 Fed. Cl. 376, 378 (2003) (Congressional consent to award interest cannot be "by implication or by use of ambiguous language")). However, although the cited maxim is manifestly true, *Crowley* itself undercuts the government's position because that case turned on whether the plaintiff was entitled to interest under the Back Pay Act, 5 U.S.C. § 5596, based upon the "non-discretionary" nature of the award to which the plaintiff was entitled, rather than what entity determined his entitlement. *Crowley*, 57 Fed. Cl. at 379-82. Furthermore, in *Crowley* interest was found to be allowable under the Back Pay Act. *Id*. at 382.

---

[7]For this Court, the no-interest rule is codified at 28 U.S.C. § 2516(a) and limits the Court's ability to award interest absent a "contract or Act of Congress expressly providing for payment thereof." 28 U.S.C. § 2516(a). This statute does not apply where a constitutional requirement exists for the payment of interest. *See, e.g., Library of Congress v. Shaw*, 478 U.S. at 317 & n.5 ("This 'constitutional requirement' arises in a taking under the Fifth Amendment. To satisfy the constitutional mandate, 'just compensation' includes a payment for interest."); *Seaboard Airline Ry. v. United States*, 261 U.S. 299, 306 (1923) ("The rule . . . that in the absence of agreement to pay [interest] or statute allowing it the United States will not be held liable for interest on unpaid accounts and claims does not apply . . . [to] [t]he requirement that 'just compensation' should be paid [for a taking under the Fifth Amendment].").

Here, the requirements of the CDA are satisfied for the Court potentially to award interest under 41 U.S.C. § 611. Jurisdictionally, the CDA requires that "there must be both a valid claim . . . and a contracting officer's final decision on that claim." *James M. Ellett Constr. Co. v. United States*, 93 F.3d 1537, 1541-42 (Fed. Cir. 1996). *See also Reflectone, Inc. v. Dalton*, 60 F.3d 1572, 1575 (Fed. Cir. 1995). For the purposes of the CDA, a "claim" is satisfied when there is (1) a written demand, (2) seeking, as a matter of right, (3) the payment of money in a sum certain. *Reflectone*, 60 F.3d at 1575. The Complaint in this case is founded upon a claim under the CDA by GSA against Tiger and a counterclaim by Tiger. *See supra*, at 4-5 n.5. Where the government has a claim against a contractor, "[a]ll claims . . . shall be the subject of a decision by the contracting officer." 41 U.S.C. § 605(a). Additionally, the contracting officer must "issue his decisions in writing, and shall mail or otherwise furnish a copy of the decision to the contractor." *Id.* If the contractor so chooses, he may bring an action directly on the claim in this Court within twelve months of the contracting officer's final decision. 41 U.S.C. § 609(a)(1), (3). As noted previously, these jurisdictional requirements have been met.

As an additional predicate for a contractor's entitlement to interest under Section 611, the contractor must submit a claim to the contracting officer. 41 U.S.C. § 611 (interest is payable "from the date the contracting officer receives the claim . . . *from the contractor*" (emphasis added)). *See Raytheon Co. v. White*, 305 F.3d 1354, 1364-65 (Fed. Cir. 2002) (Section 611 "sets a single, red-letter date for interest on all amounts found due by a court." (quoting *Servidone Const. Corp. v. United States*, 931 F.2d 860, 862 (Fed. Cir. 1991)). This requirement applies even when the principle basis for a plaintiff's complaint is a claim by the government against the contractor. *See Youngdale & Sons Const. Co. v. United States*, 27 Fed. Cl. 516, 566-67 (1993) ("[W]e are constrained to conclude that however unjust the result may be in this particular case, no interest may accrue under the CDA . . . where the contractor has failed to file a 'proper' certified claim with the CO with respect to said underlying claim."); *Elgin Builders, Inc. v. United States*, 10 Cl. Ct. 40, 44 (1986); *Ruhnau-Evans-Ruhnau Assocs. v. United States*, 3 Cl. Ct. 217 (1983). *Cf. Cupey Bajo Nursing Home, Inc. v. United States*, 23 Cl. Ct. 406, 416 (1991) (finding no jurisdiction over contractor's improperly certified counter-claim but retaining jurisdiction over a claim made by the government against the contractor). The contractor's counter-claim to the government's underlying claim must comply with the CDA's procedural and substantive requirements for submitting a "claim." *Youngdale*, 27 Fed. Cl. at 566. *See Reflectone*, 60 F.3d at 1575 (discussed *supra*).[8] Tiger's attorney on August 6, 2002, submitted to GSA's contracting officer a letter challenging GSA's prior demands for payment of $37,296.73. Compl. Exs. K, L. Tiger's letter was a written demand regarding the payment of a specified sum as a matter of right under the Contract. Moreover, GSA's contracting officer acknowledged

[8]In this instance, because Tiger's claim is for an amount less than $100,000, Tiger was not required to submit a certified claim pursuant to 41 U.S.C. § 605(c)(1) or 48 C.F.R. § 33.207. Its claim was required to be made "in writing" but did not need to be "executed by [a] person duly authorized to bind the contractor with respect to the claim" as required for a certified claim. 48 C.F.R. § 33.207. *Cf. Youngdale*, 27 Fed. Cl. at 566-67 & n.100 (improperly certified counter-claim signed by attorney not a proper basis for an award of interest).

Tiger's August 6, 2002 letter as a claim and issued her final decision on September 19, 2002, "in response" to such letter. *Id*. Ex. M. As such, Tiger has submitted a proper counter-claim to establish a basis for a potential award of interest pursuant to Section 611.

Consequently, if this Court were to find on the merits that GSA's claim against Tiger was improper, GSA's offset would have been improper, the "amount found due" requirement would be satisfied by the Court's findings, and Tiger would be entitled to interest under the CDA for the period that the offset was in effect. To rule otherwise would be to introduce an anomaly into the law. It would indeed be an odd result for the government to be able to include interest on its claim, offsetting against the contractor amounts for damages plus interest, and then succeed on an argument that no interest was due on an amount improperly offset for the time the offset was withheld from the contractor. Just as there is a live dispute between the government and Tiger about the government's claim of an alleged savings guarantee, the issue of Tiger's entitlement to interest remains viable.

**CONCLUSION**

For the reasons stated, the government's motion to dismiss on jurisdictional grounds and for failure to state a claim is DENIED, and, treating the motion as one for summary judgment, such motion is also DENIED. The defendant is ordered to respond to the Complaint within the time specified by RCFC 12(a)(2)(A).

It is so ORDERED.

s/ Charles F. Lettow
Charles F. Lettow
Judge